**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0709-19

IN THE MATTER OF
CHALLENGE OF DELAWARE
RIVERKEEPER NETWORK and
MAYA VAN ROSSUM-THE
DELAWARE RIVERKEEPER
TO DELAWARE RIVER
PARTNERS, LLC WATERFRONT
DEVELOPMENT INDIVIDUAL
PERMIT NO. 0807-16-0001.2
WFD 19001.

_____

Submitted May 10, 2021 – Decided June 23, 2021

Before Judges Messano, Hoffman and Suter.

On appeal from the Issuance of a Permit by the Department of Environmental Protection, Division of Land Use Regulations, Dated September 5, 2019.

Kacy C. Manahan and Curtin & Heffner, LLP, attorneys for appellants Delaware Riverkeeper Network and Maya Van Rossum-The Delaware Riverkeeper (Kacy C. Manahan, Mark L. Freed and Lauren M. Williams, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent Department of Environmental Protection (Melissa H. Raksa, Assistant Attorney General, of

counsel; Katherine M. Hunt, Deputy Attorney General, on the brief).

Gibbons PC, and Manko, Gold, Katcher & Fox, LLP, attorneys for respondent Delaware River Partners LLC (Paul Hauge and Kathleen B. Campbell, on the brief).

PER CURIAM

This appeal concerns a challenge by the Delaware Riverkeeper Network[1] and Maya van Rossum (appellants) to the issuance of a Waterfront Development Individual Permit and Water Quality Certificate (the Permit) to Delaware River Partners, LLC (DRP) by the Department of Environmental Protection (the DEP). The Permit authorizes DRP to construct a second dock (Dock 2) at the Gibbstown Logistics Center (GLC), a facility it is building along the Delaware River.

Appellants contend the DEP acted arbitrarily, capriciously, and unreasonably in issuing the Permit allowing Dock 2 to be built, arguing the DEP

---

[1] According to appellants, the Delaware Riverkeeper Network is a non-profit organization established in 1988 with a goal to "protect and restore the Delaware River, its tributaries and habitats." To that end, it "organizes and implements streambank restorations, a volunteer monitoring program, educational programs, environmental advocacy initiatives, recreational activities, and litigation" related to the Delaware River. See also Delaware Riverkeeper Network, https://www.delawareriverkeeper.org/ (last viewed May 20, 2021).

wrongfully: 1) did not evaluate Dock 2 as an "energy facility" under N.J.A.C. 7:7-15.4, leading it to fail to consider impacts its construction and operation may have on endangered sturgeon and submerged aquatic vegetation (SAV); 2) did not require DRP to produce sufficient information about potential impacts to water quality resulting from dredging before issuing the Permit; and 3) did not require DRP to obtain an Industrial Stormwater Permit under N.J.A.C. 7:7-16.6. After considering each argument, we are satisfied the DEP did not act arbitrarily, capriciously, or unreasonably in issuing the subject Permit. We therefore affirm.

I.

In 2016, DRP purchased part of a property situated on the Delaware River previously used by E.I. du Pont de Nemours and Company (DuPont), an industrial site known as the DuPont Repauno Works. The site, located near residential areas in Gibbstown, hosted various DuPont operations, including explosives manufacturing, industrial diamond manufacturing, and storage and shipment of ammonia. From 1951 to 1986, Atlantic City Electric also operated a power plant on the property and used a pier for the transfer of coal. Chemours Co., LLC, a successor to DuPont, continues to engage in remediation of contamination of the upland areas of the site, under supervision of the DEP.

A-0709-19

Since industrial operations on the site ceased decades ago, much of the site has naturalized. In 2003, it was designated an area in need of redevelopment pursuant to N.J.S.A. 40A:12A-1. After purchasing approximately 371 acres of the 1600-acre area, DRP proposed building the GLC, a multi-purpose wharf and one adjacent ship berth intended to replace structures constructed by DuPont in the early 1900s. According to DRP, the goal of the GLC project is to "revitalize a previously vacant, contaminated waterfront property, while making use of the site's existing rail connections and proximity to major highways, as well as its location on a portion of the Delaware River that is actively used for marine commerce."

DRP applied for a waterfront development permit and related land use permits to allow it to construct such a "multi-use deep-water port." The application stated that DRP intended the GLC to receive and load cargo from and to ships, including automobiles and other "roll-on/roll-off" cargo, and bulk liquid products including "liquid gases and energy liquid products." The DEP determined that the construction of the GLC satisfied all applicable siting conditions and environmental standards under the Energy Facility Use rule, N.J.A.C. 7:7-15.4, and the Stormwater Management rules, N.J.A.C. 7:8-1.1 to - 6.3.

4

On April 10, and June 30, 2017, the DEP issued the requested permits, which authorized DRP to dredge 460,000 cubic yards of sediment within a twenty-nine-acre area of the Delaware River, to accommodate a 750-foot-long berth for large vessels and provide access to the structure from the river's navigational channel. This construction is referred to as the "Dock 1 and Marine Terminal" project (Dock 1/GLC).

In 2018, DRP applied for a modification to the Dock 1/GLC permits to allow for changes to the proposed footprint and location of the marine terminal, which would now include "a bulk liquid storage and handling facility for the transfer of liquified natural gas and other materials." In November 2018, the DEP authorized the modification, conditioned upon DRP's compliance with all Toxic Catastrophe Prevention Act Program rules under N.J.A.C. 7:31-1.1 to -11.5.

According to the DEP, no challenges or appeals were filed by any parties, including appellants, after the 2017 Dock 1/GLC permits were issued or the 2018 modification was approved. By the time the parties filed their briefs in this appeal, construction of Dock 1 was "substantially complete," and construction of the upland portion of the GLC was underway.

A-0709-19

On March 14, 2019, DRP submitted its application for the Permit, requesting authorization to construct a second dock at the GLC that would accommodate two vessels end to end with berths "dedicated to liquid bulk cargoes." Dock 2 was intended to allow such products "to be transloaded to vessels more efficiently and effectively" than by using the single berth at Dock 1. It would be located downriver of Dock 1, in the area of the now-dilapidated Atlantic City Electric pier. While Dock 1 is fully connected to land, Dock 2 would be constructed over the water of the Delaware River, over 600 feet from the shore. Access to land would be provided by a thirty-five-foot-wide trestle with a fifty-foot-wide supporting bulkhead at the point where it reaches the shore. Dock 2 would consist of two loading platforms, breasting and mooring dolphins,[2] and walkways providing dockworker access. The dock would not include any storage tanks for liquid natural gas or any other such energy products or liquid cargoes.

Notice of the application for Dock 2 was sent to municipal and county officials in the relevant area, but the DEP failed to publish notice of the

---

[2] A dolphin is a collection of piles driven into the riverbed and bound together so as to form a fixed structure to which barges and other vessels can be moored. See Norfolk S. Ry. C o. v. Moran Towing Corp., 718 F. Supp. 2d 658, 661 (E.D. Va. 2010).

A-0709-19

application in the DEP Bulletin as required by N.J.A.C. 7:7-26.1. On March 20, 2019, the DEP deemed the application to be administratively complete pursuant to N.J.A.C. 7:7-26.2.

On May 20, 2019, the DEP issued the Permit to DRP; however, upon realizing its failure to provide the Bulletin notice, on June 5, 2019, the DEP suspended the Permit, pursuant to N.J.A.C. 7:7-27.7. The same day, the DEP published the required notice, which provided for a fifteen-day public comment period. Appellants and others sent comments opposing Dock 2. DRP provided the DEP with responses to the comments by letter dated July 15, 2019. The DEP reinstated the Permit on September 5, 2019; thereafter, it published the letter of reinstatement in the DEP Bulletin on September 18, 2019, along with detailed responses to the comments it had received.

The Permit authorized construction of Dock 2, a structure totaling 139,127 square feet in area, and the dredging of approximately 665,000 cubic yards of sediment to provide access to vessels from the river's navigation channel. However, it specified that DRP must first obtain a Tidelands instrument from DEP's Bureau of Tidelands Management and authorization for the work from the United States Army Corps of Engineers. The Permit also contained conditions intended to protect water quality, endangered fish, and SAV beds.

A-0709-19

When it begins operating, the GLC will receive liquified natural gas (LNG) by truck and rail from a facility in Pennsylvania, and will load it onto vessels at its two docks. DRP has received a permit authorizing the transport of LNG in rail cars from the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration. On February 25, 2020, the Army Corps of Engineers issued DRP a permit for Dock 2 under the Federal Clean Water Act, 33 U.S.C. § 1344, and the Rivers and Harbors Act, 33 U.S.C. § 403.

On October 18, 2019, appellants filed their notice of appeal challenging the DEP's issuance of the Permit for Dock 2.

II.

On appeal, the judicial capacity to review agency actions is "limited." Pub. Serv. Elec. and Gas Co. v. N.J. Dep't of Env't Prot., 101 N.J. 95, 103 (1985). An agency's "final quasi-judicial decision" should be affirmed unless there is a "'clear showing' that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 9 (2009) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). The reviewing court is restricted to three inquiries:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether

there is substantial evidence in the record to support the findings upon which the agency based [its] application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.

[Pub. Serv. Elec. and Gas, 101 N.J. at 103.]

"The interest of justice . . . authorizes a reviewing court to abandon its traditional deference . . . when an agency's decision is manifestly mistaken." Outland v. Bd. of Trs. of the Tchrs' Pension and Annuity Fund, 326 N.J. Super. 395, 400 (App. Div. 1999). Further, a court is "not bound by an agency's interpretation of a statute, if it is contrary to [the] legislative intent and plain meaning of the statute." Ibid.

Nevertheless, "[e]ven if a court may have reached a different result had it been the initial decision maker, it may not simply 'substitute its own judgment for the agency's.'" Circus Liquors, Inc., 199 N.J. at 10 (quoting In re Carter, 191 N.J. 474, 483 (2007)). The courts' "strong inclination" is to "defer to agency action that is consistent with the legislative grant of power." Lower Main St. Assocs. v. N.J. Hous. and Mortg. Fin. Agency, 114 N.J. 226, 236 (1989). This presumption that an agency's decision is reasonable "is even stronger when the agency has delegated discretion to determine the technical and special procedures to accomplish its task." In re Application of Holy Name Hosp. for a

Certificate of Need, 301 N.J. Super. 282, 295 (App. Div. 1997). The Legislature's delegation of power to an agency is "construed liberally when the agency is concerned with the protection of the health and welfare of the public." Barone v. Dep't of Human Servs., 210 N.J. Super 276, 285 (App. Div. 1986).

The courts also typically defer to an administrative agency's "technical expertise, its superior knowledge of its subject matter area, and its fact-finding role," Messick v. Bd. of Rev., 420 N.J. Super 321, 325 (App. Div. 2011), particularly concerning "technical matters which lie within its special competence." Application of Boardwalk Regency Corp. for a Casino License, 180 N.J. Super. 324, 333 (App. Div. 1981).

In 1973, the Legislature enacted the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, "to protect the unique and fragile coastal zones of the State." In re Egg Harbor Assocs. (Bayshore Centre), 94 N.J. 358, 364 (1983). CAFRA mandates that any proposed development within a "coastal area" that meets certain construction and development thresholds must obtain a permit or permits from the DEP before commencing construction, unless it is otherwise expressly exempted. In re Protest of Coastal Permit Program Rules, 354 N.J. Super. 293, 310 (App. Div. 2002) (citing N.J.S.A. 13:19-5, -5.2, and -

5.3). The Legislature also delegated the DEP the power to promulgate regulations "to effectuate the purposes of" CAFRA. N.J.S.A. 13:19-17(a).

The DEP executes its authority under CAFRA through the Coastal Zone Management (CZM) rules at N.J.A.C. 7:7-1.1 to -29.10. These regulations contain "the procedures for reviewing coastal permit applications and enforcing violations," and "the substantive standards for determining development acceptability and the environmental impact of projects for which coastal permits are submitted." In re Protest of Coastal Permit Program Rules, 354 N.J. Super. at 312. The rules are also used in the issuance of water quality certificates for projects subject to the Federal Clean Water Act, 33 U.S.C. § 1341.

CZM rules "are founded on . . . broad coastal goals," including: protecting "healthy coastal ecosystems," "coastal open space," and "safe, healthy and well-planned coastal communities and regions"; promoting "effective management of ocean and estuarine resources"; maintaining "meaningful public access to and use of tidal waterways and their shores"; "sustain[ing] and revitaliz[ing] water-dependent uses" such as ports and other waterfront sites while "managin[ing] dredging in an environmentally sound manner" and "promot[ing] environmentally sound and economically feasible dredged material management

11

practices"; and coordinating coastal decision-making, planning, research, education, and outreach. N.J.A.C. 7:7-1.1(c).

N.J.A.C. 7:7-1.1(d) acknowledges that when developing the CZM rules, the DEP needed to strike "balances . . . among various conflicting, competing, and contradictory local, State, and national interests in coastal resources and in uses of coastal locations." As such, the rules explicitly state that the DEP "does not expect each proposed use of coastal resources to involve all location rules, use rules, and resource rules." N.J.A.C. 7:7-1.1(e). Instead, decision making regarding a given permit application "involves examining, weighing, and evaluating complex interests using the framework provided by" the rules. Ibid.

A. Application of Relevant Regulations When Evaluating Dock 2

Appellants argue that the DEP wrongfully failed to evaluate Dock 2 as an "energy facility" under N.J.A.C. 7:7-15.4. They assert that Dock 2, independent of the rest of the GLC, meets the definition of such a facility, and that the DEP therefore should have analyzed it as such. More specifically, appellants argue that even if Dock 2 "does not meet the word-for-word definition of an LNG facility" because its operations will not involve the delivery of LNG through a pipeline, the DEP "should have liberally construed its regulations" and evaluated it as such in the interest of "the public health, safety, and welfare." They also

assert that the DEP wrongfully failed to consider siting standards for a "tanker terminal" under N.J.A.C. 7:7-15.4(q), asserting that this regulation "discourages" such facilities except at the Port of New York and New Jersey and the Port of Camden and Philadelphia. Appellants further contend the DEP failed to consider whether the dredging, construction, and boat traffic associated with Dock 2 would have an adverse impact on endangered sturgeon or on SAV beds.

Addressing appellants' arguments requires the interpretation of several provisions of CZM rules. Courts interpret regulations in the same way as statutes. In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 542 (2016). The "'paramount goal' is to determine the drafter's intent," which is generally found in the regulation's "actual language." Ibid. (quoting U.S. Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012)). Generally, a regulation's words should be given "their ordinary and commonsense meaning." In re Election Law Enforcement Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 263 (2010).

A court should view a regulation's words in the context of the entire regulatory scheme of which it is a part. Id. at 532-33. It must make every effort "to avoid rendering any part of the [regulation] superfluous." State in Interest of K.O., 217 N.J. 83, 91 (2014). The court must "presume that every word . . . has meaning and is not mere surplusage," and "must give those words effect and

A-0709-19

not render them a nullity." In re Attorney General's "Directive on Exit Polling: Media & Non-Partisan Pub. Interest Grps.", 200 N.J. 283, 297-98 (2009). Further, a court must not "rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning." U.S. Bank, 210 N.J. at 199. It "cannot insert qualifications into a statute or regulation that are not evident" from that language. Id. at 202.

While a court is not bound by the agency's interpretation of a statute or its determination of strictly legal issues, id. at 200, courts do defer to an agency's interpretation of a regulation "within the sphere of its authority" unless the interpretation is "plainly unreasonable." In re Election Law Enforcement Comm'n, 201 N.J. at 262. This is because "a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." Ibid. In general, it is assumed that "the agency that drafted and promulgated the rule should know the meaning of that rule." In re Gen. Permit No. 16, 379 N.J. Super. at 341-42 (App. Div. 2003). However, an agency may not use its power to interpret its own regulations as a means of amending them or adopting new ones without following proper rulemaking procedures under the Administrative Procedure Act (APA), N.J.S.A.

52:14B-4.  <u>Venuti v. Cape May Cnty. Constr. Bd. of Appeals</u>, 231 N.J. Super 546, 554 (App. Div. 1989).

<u>Energy Facility Definition Generally</u>

In its comment protesting the Dock 2 permit, appellants argued that the DEP should evaluate the project as an energy facility, as an "LNG facility," a "tanker terminal," or both.

N.J.A.C. 7:7-15.4(a) states that the term "energy facility" includes "facilities, plants or operations for the production, conversion, exploration, development, distribution, extraction, processing, or storage of energy or fossil fuels," as well as "onshore support bases and marine terminals."  N.J.A.C. 7:7-15.4(b) and (c) set forth general standards regarding the siting of new energy facilities, then subsections (d) through (s) state specific standards and siting rules for sixteen types of facilities: outer Continental Shelf oil and gas exploration and development; onshore support bases; platform fabrication yards and module construction; repair and maintenance facilities; pipe coating yards; pipelines and associated facilities; gas separation and dehydration facilities; gas compressor stations; gas pigging facilities; gas processing plants; other gas related facilities; oil refineries and petrochemical facilities; storage for crude oil, gases, and other potentially hazardous liquid substances; tanker terminals;

15

electric generating stations; and LNG facilities. N.J.A.C. 7:7-15.4 does not reference new docks added to existing facilities that have already been granted permits under the requirements of the relevant subsection(s).

N.J.A.C. 7:7-9.11(a)(2) states that "[s]tandards for a docking facility or concentration of docks for a single industrial or manufacturing facility are found at N.J.A.C. 7:7-12.4." This regulation further states that "[d]ocks and piers for cargo movements are encouraged." N.J.A.C. 7:7-9.11(e). N.J.A.C. 7:7-12.4(a) defines "[d]ocks and piers for cargo and passenger movement" as "structures supported on pilings driven into the bottom substrate or floating on the water surface, used for loading and unloading passengers or cargo, including fluids, connected to or associated with, a single industrial or manufacturing facility or to commercial fishing facilities." N.J.A.C. 7:7-12.4(b) states that such docks and piers are "conditionally acceptable" provided they meet certain width and length standards, they "will not post a hazard to navigation," and "[t]he associated use of the adjacent land meets all applicable rules of this chapter."

We conclude the DEP did not act arbitrarily, capriciously, or unreasonably when it decided not to evaluate Dock 2 as an "energy facility" under N.J.A.C. 7:7-15.4. Dock 2 does not, in itself, appear to fit into any of the sixteen categories set forth in that regulation. The dock consists solely of berths for

16

vessels and associated structures. It includes no storage tanks or other apparatus for holding energy products, and none of the other activities discussed in N.J.A.C. 7:7-15.4(d) through (s) will take place there. Further, the DEP already evaluated the GLC using the appropriate standards for its type of energy facility. Dock 2 more appropriately fits under N.J.A.C. 7:7-12.4, which explicitly concerns docks used for loading and unloading cargo, including fluids, that are connected to or associated with an industrial or manufacturing facility.

LNG Facility Analysis

Next, we address appellants' specific arguments that Dock 2 should have been evaluated as an "LNG facility," that it is an improperly sited "tanker terminal," and that the DEP did not consider potential harms to sturgeon and SAV.

N.J.A.C. 7:7-15.4(s) states:

> New marine terminals and associated facilities that receive, store, and vaporize liquefied natural gas for transmission by pipeline are discouraged in the coastal zone unless a clear and precise justification for such facilities exists in the national interest; the proposed facility is located and constructed so as to neither unduly endanger human life and property, nor otherwise impair the public health, safety and welfare . . . and such facilities comply with the [CZM] rules.

A-0709-19

When considering an application for a proposed LNG facility, the DEP "will consider siting criteria including, but not limited to: (1) the risks inherent in tankering LNG along New Jersey's waterways; (2) the risks inherent in transferring LNG onshore; and (3) the compatibility of the facility with surrounding land uses, population densities, and concentrations of commercial or industrial activity." N.J.A.C. 7:7-15.4(s)(1)(ii).

Here, in its response to comments, the DEP stated that the GLC does not fit the definition of an LNG facility under N.J.A.C. 7:7-15.4(s) because DRP intends to load LNG from trucks and rail cars onto vessels; no pipelines are involved. The DEP also stated that during the evaluation process for the Dock 1/GLC permit and its later modification, it analyzed the overall operation as an energy facility with storage tanks for crude oil or other hazardous liquids.

We reject appellants' argument that the DEP was required to evaluate Dock 2 as an LNG facility in its own right. The dock will not "store" or "vaporize" LNG , and will not "receive" it "for transmission by pipeline." Thus, under the plain language of N.J.A.C. 7:7-15.4(s), it does not constitute an "LNG facility." We also find no merit in appellants' argument that despite the lack of pipelines at the GLC, the DEP should have "liberally construed" N.J.A.C. 7:7-15.4(s) to cover Dock 2. Such a reading of the regulation may well have run

18

afoul of the prohibition against an agency "interpreting" a rule as a substitute for amending it through the procedures laid out in the APA. Venuti, 231 N.J. Super. at 554. Further, although this argument may have been better directed against the GLC, the record demonstrates that notwithstanding the fact that the GLC did not meet the definition of an "LNG facility" under the regulation, the DEP did consider the hazards associated with the transloading of LNG at the facility when issuing the Dock 1/GLC permit. We conclude the DEP did not act arbitrarily, capriciously, or unreasonably by determining that Dock 2 did not need to be evaluated as an LNG before issuing the Permit.

Tanker Terminal Location Analysis

N.J.A.C. 7:7-15.4(q) provides that "[n]ew or expanded tanker facilities are acceptable only in existing ports and harbors where the required channel depths exist to accommodate tankers." It further states that "multicompany use" of such tanker terminals is "encouraged in the Port of New York and New Jersey and the Port of Camden and Philadelphia," and that "[n]ew tanker terminals are discouraged in areas" outside of those two named ports. Ibid. Additionally, "[o]ffshore tanker terminals and deepwater ports are discouraged." Ibid.

"Discouraged" is defined in N.J.A.C. 7:7-1.5 to mean that "a proposed use of coastal resources is likely to be rejected or denied as [DEP] has determined

19

that such uses . . . should be deterred;" however, the DEP "may permit the use" in cases where it "considers the proposed use to be in the public interest despite its discouraged status." Ibid. The use may be conditioned upon the implementation of "mitigating or compensating measures . . . so that there is a net gain in quality and quantity of the coastal resource of concern." Ibid. For example, in In re Stream Encroachment Permit No. 0200-04-0002.1 FHA, 402 N.J. Super. 587, 605 (App. Div. 2008), we affirmed the issuance of a permit by the DEP despite the fact that the proposed waterway filling covered by the permit was "discouraged" by N.J.A.C. 7:7-12.11(e)[3] in the relevant area. We reasoned that the DEP had "found the project to be in the public interest," and noted that a "significant environmental mitigation program" had been proposed. Ibid. Importantly, the court stated that the regulation "[did] not prohibit development and filling, rather it is 'discouraged.'" Ibid.

Here, the DEP stated in its response to comments that it considered the tanker terminal location standards in N.J.A.C. 7:7-15.4(q) during the Dock 1/GLC permitting process. It explained that this provision was meant to "concentrat[e] these types of industries in existing port areas, like the Delaware

_____

[3] The case cites to N.J.A.C. 7:7E-4.10. This provision was recodified as N.J.A.C. 7:7-12.11, effective July 6, 2015. See 46 N.J.R. 1051(a), 47 N.J.R. 1392(a).

River region, and locat[e] these types of industries at existing port facilities which currently handle the storage of crude oil, gases and other hazardous substances." Appellants contend that this response suggests that DEP "erroneously believed" that N.J.A.C. 7:7-15.4(q) "applied to the entire Delaware River," as opposed to specifically the two named ports.

We conclude that Dock 2, the project covered by the Permit, is not in itself any type of "energy facility," including a tanker terminal; however, we acknowledge this is a slightly closer issue. "Tanker terminal" is not defined in detail in N.J.A.C. 7:7-15.4(q) or elsewhere in the CZM rules, and so the words should be given their "ordinary and commonsense meaning." In re Election Law Enforcement Comm'n, 201 N.J. at 263. Merriam-Webster Dictionary defines "tanker" as "a cargo ship fitted with tanks for carrying liquid in bulk."[4] Its definition of "terminal" that is most applicable in this context is "either end of a carrier line having facilities for the handling of freight and passengers."[5] By these definitions, the GLC is a tanker terminal. Dock 2 may also arguably meet

---

[4] See Tanker, Merriam-Webster, https://www.merriam-webster.com/dictionary/tanker (last viewed May 20, 2021).

[5] See Terminal, Merriam-Webster, https://www.merriam-webster.com/dictionary/terminal (last viewed May 20, 2021).

these definitions, because it is a structure where liquid cargo from vessels will be loaded; however, we are satisfied that for purposes of CZM rules, Dock 2 is not a tanker terminal, because it is merely an additional set of two berths at a preexisting facility that has already been evaluated under the tanker terminal standards.

We further find no merit in appellants' argument that the DEP should not have issued the Permit due to the location of Dock 2 in an area where tanker terminals are "discouraged." N.J.A.C. 7:7-15.4(q) does not absolutely forbid such facilities from being sited outside the Port of New York and New Jersey and the Port of Camden and Philadelphia. Rather, under N.J.A.C. 7:7-1.5, and similar to the situation in In re Stream Encroachment Permit, 402 N.J. Super. at 605, a tanker terminal may be located in other areas if the DEP determines that it is in the public interest despite the "discouraged" status. Moreover, this argument would have been more appropriately directed toward the siting of the GLC but now that the GLC is located where it is, any added berths like Dock 2 logically must be built at the same site. For these reasons, we conclude the DEP did not act arbitrarily, capriciously, or unreasonably by issuing the Permit without evaluating Dock 2 as a new tanker terminal under N.J.A.C. 7:7-15.4(q).

22

Impacts to Sturgeon and SAV

N.J.A.C. 7:7-16.2(b) states that "[a]ny activity that would adversely impact the natural functioning of marine fish, including the reproductive, spawning and migratory patterns or species abundance or diversity of marine fish, is discouraged." More specifically, the DEP may authorize dredging in a waterway "on a seasonally restricted basis," if the area is a "known spawning, wintering or nursery area[] of shortnose sturgeon, winter flounder, Atlantic sturgeon, alewife, blueback herring, striped bass or blue crab," or if it is "downstream of known anadromous fish spawning sites . . . where the predicted turbidity plume will encompass the entire cross-sectional area of the water body, thus forming a potential blockage to upstream migration." N.J.A.C. 7:7-12.7(c)(10)(vii). The DEP will weigh the "ecological values" stated in these regulations "in comparison to the public value to be served by the new dredging." N.J.A.C. 7:7-12.7(h).

Here, appellants asserted during the public comment period that Dock 2 could have a negative impact on federally protected Atlantic sturgeon and short-nosed sturgeon, which use the Delaware River as a breeding and foraging ground, and on SAV growing in the riverbed. As part of its permit application for Dock 2, DRP performed analyses of fish migratory pathways as required by

23

N.J.A.C. 7:7-9.5, of endangered and threatened wildlife and plant species habitats as required by N.J.A.C. 7:7-9.36, and of the presence of SAV as required by N.J.A.C. 7:7-9.6. DRP's construction plan included best practices intended to protect sturgeon and other fish in the river. These included ceasing all in-water work and disturbances to sediment from March 15 to June 30 of each year, when sturgeon are most likely to be migrating and spawning. This condition was also present in the 2017 Dock 1/GLC permit.

In its application, DRP stated that the dock will attract approximately thirty-seven vessels to be loaded with "liquid bulk products" per year. DRP stated in response to appellants' comment that this predicted traffic represented no increase to vessel traffic in the Delaware River compared to that already predicted for Dock 1. It explained that the original Dock 1/GLC application accounted for ninety-one vessels annually to use the facility; however, the proposed use of the facility had since shifted to involve more bulk liquid products such as LNG, which involves ships that need to stay in dock longer to be filled to capacity. As a result, DRP estimated that fifty-two vessels per year would use Dock 1; added to the thirty-seven predicted for Dock 2, the number of vessels that would call at the GLC each year would total eighty-nine.

A-0709-19

A report issued by the National Marine Fisheries Service (NMFS) in 2017, in connection with DRP's application for an Army Corps of Engineers permit for Dock 1 and the GLC, stated that the increase in vessel traffic associated with Dock 1 would be "very small (0.37%) relative to the then-existing baseline of traffic on the Delaware River." This report opined that vessels bound for and berthed at Dock 1 could strike sturgeon, but predicted that only seven fish deaths would result over a thirty-year period of the GLC's operation. The NMFS stated that this level of casualties would not present a risk to the continued existence of endangered sturgeon species. In a November 2019 letter, it stated that the construction and operation of Dock 2 would not adversely affect sturgeon to any greater degree than the minimal impact already caused by Dock 1. The DEP thus concluded that Dock 2 "would not impact marine fisheries," and included conditions in the Permit mirroring DRP's stated best practices, including the limitation on the time for dredging.

In its response to comments, the DEP also stated that DRP had mapped out Dock 2 and its associated dredge area "to avoid the existing [SAV] beds" in the area of the river near the GLC, and that DRP was "continuing to evaluate the project area for the presence of SAV to ensure that impacts to this resource are minimized." A map of the proposed Dock 2 shows that it will be located far

from shore, away from most of the known SAV beds in the area. A survey of Dock 2's proposed location revealed one "small SAV bed and some solitary plants" within fifteen feet of the dock's connecting trestle; it concluded that 0.011 acres of SAV might be "shaded" by the trestle and that approximately 6.3 square feet of SAV would be removed to place supporting piles for the structure.

Appellants further contend that on September 19, 2019, the DEP informed DRP "that the SAV mitigation had failed," and that therefore, there is no "viable mitigation plan" in place; however, the SAV mitigation plan appellants reference pertained to the construction of Dock 1, not Dock 2.

We reject appellants' argument that because the DEP did not evaluate Dock 2 as an energy facility under N.J.A.C. 7:7-15.4, it failed to consider the potential negative impacts to fish and SAV that could result from the dock's construction and operation. Instead, the record contains substantial evidence supporting the DEP's findings that the Dock 2 project would present no, or relatively little, threat to any species. Mindful of the deference we should show to an agency in its areas of expertise, Messick, 420 N.J. Super at 325, we conclude the DEP did not act arbitrarily, capriciously, or unreasonably when issuing the Permit.

## B. Information About Impacts to Water Quality

Appellants assert the DEP issued the Permit without requiring DRP to provide sufficient information about negative impacts on water quality that may result from the construction of Dock 2. They contend the DEP wrongfully failed to require DRP to include testing for nitrobenzene, aniline, and volatile organic compounds (VOCs) in its Sediment Sampling and Analysis Plan (SSAP), despite the "known contamination" of the former DuPont site. They also argue that the DEP should not have issued the Permit without waiting for DRP to provide the results of an "effluent (modified) elutriate analysis." Appellants claim that this analysis, and testing for those contaminants, would have provided DEP with "vital information" about the possibility that river water would become contaminated due to the dredging associated with Dock 2's construction.

### Testing for Specific Contaminants

N.J.A.C. 7:7-12.7(b) states that "new dredging and the management of the dredged material shall be conducted in accordance with Appendix G" to CZM rules. The regulation further states that an applicant for a permit under CZM rules may be required, before beginning any dredging, to conduct "chemical and physical analysis of the dredged material, including water quality predictive analyses for surface water and ground water," if the DEP "suspects

contamination of sediments."  N.J.A.C. 7:7-12.7(c)(10)(ii).  If the pre-dredging chemical analysis "reveals significant contamination," and/or if "predicted water quality parameters are likely to exceed" the DEP's surface water quality standards, the DEP "will work cooperatively with the applicant to fashion acceptable control measures . . . ."  N.J.A.C. 7:7-12.7(c)(10)(iv).

Here, in advance of its permit application for Dock 2, DRP prepared and submitted to the DEP its SSAP:  its plan to collect and test sediment samples in the area to be dredged for the project, to determine whether certain contaminants were present which, when disturbed, could affect water quality in the area.  The DEP approved the SSAP in December 2018.  Thereafter, in January and February 2019, the DRP collected sixty-four core samples from sediments within the dredging area, which were then composited.  The twenty-two composite samples were subjected to laboratory analyses for semi-volatile organic compounds, dioxins, furans, pesticides, metals, polychlorinated biphenyls, and other materials, including nitrobenzene.  Ultimately, all of the tested-for contaminants were either not detected, or were detected at concentrations below the DEP's most stringent standards for soils – those for residential areas where humans may come into direct contact with the soil.  See N.J.A.C. 7:26D-4.2; N.J.A.C. 7:26D, App. 1.

A-0709-19

In March 2019, DRP submitted a Dredged Material Management Plan (DMMP) to DEP presenting the testing results and a proposed plan for managing and disposing the sediments that would be dredged. The DMMP set forth several "Best Management Practices" to minimize loss of material into the river during dredging and to thus reduce the amount of suspended sediments left behind in the water.

The DEP approved the DMMP, and the dredging practices proposed by DRP were incorporated into the Permit as conditions. For example, just as the DMMP stated, the Permit requires the use of a "clamshell bucket" equipped with sensors to ensure complete closure before it lifts any sediment from the water, imposes conditions on the rate of descent and ascent of the bucket, and requires the hiring of an independent dredging inspector to monitor the project and submit weekly inspection forms to the DEP. It also requires that all barges and holding scows transporting dredged sediment for disposal be watertight, and only allows water from these vessels to be discharged into the river after dredge material has been held for at least twenty-four hours to make sure all sediments settle and are not released. These conditions conform to the "Best Management Practices" set forth in N.J.A.C. 7:7 Appendix G, Chapter IV, Subsection A.3, and are the same as those imposed in the Dock 1/GLC permit.

Appellants allege the DEP should not have issued the Permit without requiring DRP to test for nitrobenzene, aniline, and VOCs. We find the arguments as to each of these types of contaminant unavailing. First, although nitrobenzene was not listed in the summary tables of DRP's DMMP, the record reflects that DRP did test for this compound, but that it was not detected in any of the sediment samples sent for analysis. Appellants' argument about nitrobenzene is therefore factually incorrect and lacks merit.

Next, N.J.A.C. 7:7 Appendix G, Attachment C, Subsection I(a) states: "[r]equired bulk sediment chemistry, modified elutriate, and leaching tests must include analysis for all target analytes listed in Attachment D, excepting the [VOC] list, which will be required on a case-by-case basis. Typically, [VOC] testing will be instituted where known or suspected discharges of such compounds have occurred." As a result, DRP would only have been required to test for VOCs if the DEP knew or had reason to suspect that the sediments in the area to be dredged for Dock 2 would contain such contaminants. Although appellants point to the "known" contamination of the DuPont site in support of their argument that the DEP should have required VOC testing, we note that the dredging associated with Dock 2's construction will occur significantly away from the shoreline. No evidence in the record suggests that any theoretical

contamination with VOCs present in the upland parts of the DuPont site extends into the underwater sediments in the area of the river where the dredging for Dock 2 will happen. We conclude the DEP's exercise of discretion in not requiring testing for VOCs was not arbitrary, capricious, or unreasonable.

Finally, N.J.A.C. 7:7 Appendix G, Attachment D, which lists all of the contaminants for which pre-dredging testing is required, does not include aniline.[6] As a result, DRP was not required to test for this compound, and the issuance of the Permit without such a test was proper.

Effluent Elutriate Analysis

N.J.A.C. 7:7 Appendix G, Chapter IV, Subsection A, Table 1 sets forth the types of sediment testing an applicant must perform before it may begin any dredging project, based on the type of facility where the dredged sediments will ultimately be taken for disposal. The table identifies four categories of "dredged material management" facilities: "open water" sites, "subaqueous disposal pits," "containment areas" which may be located on "existing islands" or in "nearshore areas," and "upland confined disposal facilities (CDFs)." Ibid.

_____

[6] Attachment D lists derivatives of aniline: 4-chloroaniline, and 2-, 3-, and 4-nitroaniline. However, these are different compounds from aniline itself. See https://en.wikipedia.org/wiki/Aniline (last viewed May 20, 2021).

An "effluent (modified) elutriate analysis" is a type of sediment analysis "[u]sed to predict the quality of dewatering effluent discharged from upland confined disposal facilities and similar operations." N.J.A.C. 7:7, App. G, Ch. VII.[7] Appendix G, Chapter IV, Subsection A, Table 1 provides that this test is required where sediment will be disposed in a containment area or at an upland CDF. However, if an open water site or a subaqueous disposal pit will be used, the test "may be required when dredge material originates in a waterbody different from that in which the management site is located." Ibid.

Here, when DRP submitted its SSAP to DEP in 2018, it identified six potential sites for disposal of its dredged materials, several of which were upland CDFs. As such, the SSAP also included a plan for effluent elutriate analysis. It appears that this test was completed along with the other tests described above. However, the DMMP did not include the results of test because they were not yet available at the time it was submitted, and they are also not part of the record on appeal.

---

[7] An elutriate test involves mixing dredged material with dredge-site water and allowing the mixture to settle. The potential release of any dissolved chemical constituents in the dredged material is determined by chemical analysis of the liquid lying above the heavier material. N.J.A.C. 7:7, App. G, Ch. IV.

When it submitted the DMMP, DRP had decided based on the SSAP's results to narrow its alternatives for sediment disposal to two potential locations: White's Rehandling Basin, located on the Delaware River a few miles from the GLC, and Fort Mifflin, a facility in Pennsylvania operated by the Army Corps of Engineers.[8]  White's Rehandling Basin is an open water disposal site; its operator, Weeks Marine, Inc., disposes of sediments by dumping them into an enclosed portion of the river that is considered the same waterbody as the area from which DRP will be dredging.  Located outside New Jersey, Fort Mifflin is subject to Pennsylvania's sediment testing and analysis requirements.

The Permit provides that if DRP decides to use White's Rehandling Basin for disposal, it must comply with all conditions specified in the operational permits DEP has issued to Weeks Marine, Inc.  If DRP uses Fort Mifflin, it must obtain additional approvals from the Pennsylvania Department of Environmental Protection.  Should DRP choose any other location, it must request a modification of the Permit.

---

[8]  White's Rehandling Basin and Fort Mifflin are stated as approved disposal sites for sediments DRP dredged and/or continues to dredge in relation to the construction of the GLC and Dock 1, in the 2017 permit.

We conclude the DEP did not act arbitrarily, capriciously, or unreasonably when it issued the Permit without requiring DRP to submit the results of its effluent elutriate analysis. According to the plain language of N.J.A.C. 7:7 Appendix G, Chapter IV, Subsection A, Table 1, this test was not required if DRP utilizes White's Rehandling Basin to dispose of its dredged sediments. It was also not required if DRP utilizes Fort Mifflin; although DRP may need to submit the test results to Pennsylvania's Department of Environmental Protection, this state's DEP did not need to see them.

In summary, we affirm the issuance of the Permit, as DRP conducted all required pre-dredging chemical testing of sediments in the proposed dredging area in accordance with CZM rules, and the DEP reviewed all of the results and imposed conditions in the Permit that were in line with the Best Management Practices for dredging outlined in those rules. As such, the DEP properly considered the possibility of negative impacts to water quality.

### C. Industrial Stormwater Permit

Appellants also contend the DEP wrongfully issued the Permit without requiring that DRP first obtain an Industrial Stormwater Permit for Dock 2. They argue that Dock 2 constitutes a "major development" under N.J.A.C. 7:8-1.2, and that therefore such a permit was required by N.J.A.C. 7:7-16.6.

34

CZM Rules provide that "[i]f a project or activity meets the definition of 'major development' at N.J.A.C. 7:8-1.2, then [it] shall comply with the Stormwater Management rules at N.J.A.C. 7:8." N.J.A.C. 7:7-16.6(a). Compliance is "appropriate" because "development and land use activities contribute greatly to the types and amount of pollutants that are found in stormwater runoff," and the rules "provide minimum Statewide runoff techniques, as well as special protection measures for environmentally sensitive water and land areas." N.J.A.C. 7:6-16.6(b).

Under N.J.A.C. 7:8-1.2, a "major development" is "any development that provides for ultimately disturbing one or more acres of land or increasing impervious surface by one-quarter acre or more." "Disturbance" means "the placement of impervious surface or exposure and/or movement of soil or bedrock or clearing, cutting, or removing of vegetation." Ibid. "Impervious surface" means "a surface that has been covered with a layer of material so that it is highly resistant to infiltration by water." Ibid.

As previously noted, the courts generally defer to an agency's interpretation and application of a regulation "within the sphere of its authority" unless its view or action is "plainly unreasonable." In re Election Law Enforcement Comm'n, 201 N.J. at 262. In In re Freshwater General Permit No.

7, 405 N.J. Super. 204, 214 (App. Div. 2009), we specifically deferred to the DEP's interpretation of what constitutes a "major development" under N.J.A.C. 7:8-1.2 when upholding the issuance of a permit to the respondent related to the digging of a ditch, without requiring him to comply with the Stormwater Management rules. The appellant, who owned adjacent land, argued that this was improper in part because the overall project the ditch was part of was an indoor ice rink that added enough new impervious surface to be considered a "major development." Id. at 212-14. We affirmed the DEP's decision granting the permit, agreeing with the agency that the permit was "limited to the activities in the ditch, not the ice rink" and that the ditch, in itself, disturbed less than an acre of land and did not create new impervious surface over more than one-quarter acre. Id. at 213-14.

Here, as part of the Dock 1/GLC permitting process, DRP was required to show compliance with the Stormwater Management rules, N.J.A.C. 7:8-1.1 to -6.3, by designing a stormwater management system for the facility. The DEP concluded that DRP's plan satisfied the relevant standards.

The plans for the construction of Dock 2 show that the new dock structure will be mostly over water, and will add approximately 1250 square feet of impervious surface landward of the Delaware River's mean high water line.

36

Dock 2 will not cause any physical changes to the facility site that have required modifications to DRP's existing stormwater management system. Appellants argued in its public comment letter that the Stormwater Management rules applied to the Dock 2 project, but the DEP responded that no further analysis under those rules was required.

We conclude that, as in In re Freshwater General Permit No. 7, the DEP properly found that Dock 2, considered by itself, was not a "major development" as defined by N.J.A.C. 7:8-1.2. While construction of the dock will require significant underwater dredging, it does not involve the "movement of soil or bedrock or clearing, cutting, or removing of vegetation" over more than one acre of dry land because the bulk of the new structure will be erected over water connected only by a relatively narrow trestle. It will add impervious surface much less than the quarter-acre stated in the regulation.[9] Although the GLC, in total, constitutes a "major development" requiring compliance with the Stormwater Management rules, the matter under review concerns only Dock 2 and DRP has already demonstrated compliance as to the greater facility. We therefore conclude the DEP did not act arbitrarily, capriciously, or unreasonably

---

[9] Since one acre equals 43,560 square feet, under N.J.A.C. 7:8-1.2, a "major development" is one that disturbs at least that area of land or that adds over 10,890 square feet of impervious surface.

when it issued the Permit without first requiring that DRP obtain an Industrial Stormwater Permit.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0709-19