SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**In the Matter of the Revocation or the Suspension of the Provisional Accreditation of and/or the Imposition of Probation on Eastwick College LPN-to-RN Bridge Program (A-35-14) (074772)**

**Argued January 6, 2016 -- Decided July 13, 2016**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court interprets N.J.A.C. 13:37-1.3(c), a regulation promulgated by the State Board of Nursing (Board) to govern the accreditation of new nursing programs.

The Board prescribes rules and regulations governing the profession of nursing, including the process for the accreditation of schools of professional nursing. Pursuant to the Board's process, a provisionally accredited nursing program must be denied full accreditation unless "[s]eventy-five percent of [the program's] students from the first or second graduating class," who take the licensing examination for registered nurses (the National Council Licensure Examination for Registered Nurses (NCLEX-RN)), "pass the examination the first time it is taken by the student." N.J.A.C. 13:37-1.3(c)(2). The Board's regulation does not define the term "graduating class," or otherwise specify how a nursing program's "graduating class" should be defined when the pass rate is calculated.

This appeal arose from Eastwick College's (Eastwick) application for the accreditation of its Licensed Practical Nurse to Registered Nurse Bridge Program (Bridge Program), a nursing program designed to meet the needs of licensed professional nurses aspiring to become registered nurses. The Board granted provisional accreditation to the Bridge Program in 2009, and Eastwick's first group of students received their associate nursing degrees in January 2011. Eastwick graduated additional groups of students in April, July and October 2011. When the examination results of all of the students who graduated from the Bridge Program in 2011 and took the NCLEX-RN during that year were aggregated, the pass rate was 69.49%, short of the 75% required by N.J.A.C. 13:37-1.3(c)(2). The Board requested that Eastwick assess the deficiencies in its program and present an action plan to improve student performance, which Eastwick submitted in July 2012.

Subsequently, 76.29% of the students who graduated from the Bridge Program in 2012 and took the NCLEX-RN examination for the first time that year passed the examination. Eastwick reported those results to the Board. The Board, however, recalculated the NCLEX-RN pass rate for the Bridge Program's "second graduating class" using a different methodology. The Board included the test results of twenty-four students who graduated from the Bridge Program in 2011, but did not take the NCLEX-RN examination until 2012. On that basis, the Board calculated a 71.07% pass rate -- short of the required 75% -- for that class. On June 24, 2013, the Board entered a Provisional Order of Probation and Denial of Accreditation (Provisional Order), and later voted to implement its Provisional Order as a Final Order of Probation and Denial of Accreditation (Final Order).

Eastwick appealed, contending that only students who graduated during a specific calendar year and took the licensing examination in that year should be included in that year's "graduating class." Using that methodology, Eastwick argued that its second graduating class had a pass rate in excess of 75%, and that the Board improperly declined to accredit its nursing program. The Appellate Division affirmed the Board's determination denying accreditation, concluding that the Board's findings were supported by substantial credible evidence in the record.

The Court granted Eastwick's petition for certification. 220 N.J. 572 (2015).

**HELD**: Based on the plain language of N.J.A.C. 13:37-1.3(c)(2), the Board's construction of its regulation is plainly unreasonable. Accordingly, the Board improperly denied accreditation to Eastwick's Bridge Program.

1. An appellate court defers to an agency's interpretation of a regulation, within the sphere of its authority, unless the interpretation is "plainly unreasonable." To apply the "plainly unreasonable" standard, the Court first considers the words of the statute, affording to those words their ordinary and commonsense meaning. Should the plain

1

language analysis yield more than one plausible interpretation of the regulation, a reviewing court may consider extrinsic sources, including the long-standing meaning ascribed to the language by the agency charged with its enforcement. If, however, the regulation's language is clear, then the interpretative process will end without resort to extrinsic sources. (pp. 10-12)

2. Guided by those principles, the Court considers the meaning of the term "first or second graduating class" in N.J.A.C. 13:37-1.3(c)(2). First, in its ordinary and commonsense usage, the term "class," modified by "graduating," describes a group of students who complete a program of studies and receive their diplomas or certificates in a given calendar year. Second, N.J.A.C. 13:37-1.3(c)(2) is plainly intended to give a new nursing program two opportunities to succeed. Should the "first graduating class" fail to achieve satisfactory test results, the program's administrators may critically evaluate the program and address any deficiencies revealed by the first class's examination results. To that end, the Board is presented with two sets of NCLEX-RN results, reflecting the achievements of distinct groups of students graduating in different years, and tested by the NCLEX-RN examination administered in the year of graduation. Thus, the clear objective of N.J.A.C. 13:37(c)(2) is furthered if the "second graduating class" includes only students who have graduated from the program in its second year, following the program's opportunity for self-evaluation and improvement. (pp. 12-14)

3. The Board's interpretation of the term "first or second graduating class" is incongruent with the language of its regulation. Nothing in N.J.A.C. 13:37-1.3(c)(2) suggests that a "graduating class" is defined by the date of the licensing examinations that its students choose to take. Moreover, the Board's interpretation of N.J.A.C. 13:37-1.3(c)(2) would undermine the objective of giving new nursing programs an opportunity to assess and resolve deficiencies revealed by the pass rate of the first "graduating class." (p. 14)

4. The language of N.J.A.C. 13:37-1.3(c)(2) stands in stark contrast to that of the regulations implemented in other jurisdictions, cited by the Board as evidence of a national practice. The regulations in effect in other jurisdictions clearly place their states' nursing programs on notice that for purposes of accreditation, their licensing examination pass rates will be calculated based on the students' year of examination, whether or not they graduated in that year. In contrast, the Board has not incorporated its stated methodology into N.J.A.C. 13:37-1.3(c)(2). (pp. 14-15)

5. In short, notwithstanding the Court's deferential review of the Board's construction of its regulation, the Court discerns no foundation for the Board's interpretation of the plain language in N.J.A.C. 13:37-1.3(c)(2), and finds the Board's interpretation of N.J.A.C. 13:37-1.3(c)(2) to be plainly unreasonable. When the Board calculated the NCLEX-RN examination pass rate for the "second graduating class" of Eastwick's Bridge Program, it improperly included the examination results of students who graduated from the Bridge Program during its first year, 2011, but did not take the examination until 2012. Under a proper application of N.J.A.C. 13:37-1.3(c)(2), the Board would have found the "second graduating class" of Eastwick's Bridge Program to have achieved a NCLEX-RN pass rate above the required 75%. Therefore, the Board's Final Order denying accreditation and placing the Bridge Program on probation was unsupported by substantial credible evidence in the record, and the Board improperly denied accreditation in accordance with N.J.A.C. 13:37-1.1 to -1.3. (pp. 16-17)

6. In closing, the Court makes no determination as to whether Eastwick would have met the requirements to maintain accreditation, prescribed in N.J.A.C. 13:37-1.4 to -1.15, after the Board's Final Order. The Court directs that on remand, a record regarding the Bridge Program's status following the Final Order can be developed, and an appropriate remedy determined. (p. 17)

The judgment of the Appellate Division is **REVERSED** and the matter is remanded to the State Board of Nursing for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER, JUSTICES ALIBN and SOLOMON, and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion. JUSTICES LaVECCHIA and FERNANDEZ-VINA did not participate.**

IN THE MATTER OF THE
REVOCATION OR THE SUSPENSION
OF THE PROVISIONAL
ACCREDITATION OF AND/OR THE
IMPOSITION OF PROBATION ON

EASTWICK COLLEGE
LPN-TO-RN BRIDGE PROGRAM

APPROVED TO ESTABLISH A
SCHOOL OF REGISTERED NURSING
IN THE STATE OF NEW JERSEY.

Argued January 6, 2016 – Decided July 13, 2016

On certification to the Superior Court, Appellate Division.

Robert A. Mintz argued the cause for appellant Eastwick College (McCarter & English and Schulman & Kissel, attorneys; Julian A. Schulman, on the briefs).

Olga E. Bradford, Deputy Attorney General, argued the cause for respondent New Jersey State Board of Nursing (John J. Hoffman, Acting Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel).

JUSTICE PATTERSON delivered the opinion of the Court.

In this appeal, the Court interprets N.J.A.C. 13:37-1.3(c), a regulation promulgated by the State Board of Nursing (Board) to govern the accreditation of new nursing programs. Pursuant to the regulation, a provisionally accredited nursing program must be denied full accreditation unless "[s]eventy-five percent

1

of [the program's] students from the first or second graduating class," who take the licensing examination for registered nurses, "pass the examination the first time it is taken by the student." N.J.A.C. 13:37-1.3(c)(2). A new nursing program that fails to meet that benchmark is placed on probation and barred from admitting new students, and may lose its provisional accreditation.

In 2013, the Board invoked N.J.A.C. 13:37-1.3(c)(2) to deny accreditation to the Licensed Practical Nurse to Registered Nurse Bridge Program (Bridge Program), a nursing program instituted by Eastwick College (Eastwick). Interpreting the term "graduating class" in N.J.A.C. 13:37-1.3(c)(2) to include all graduates of the program who took the licensing examination during a given calendar year, regardless of the year a particular student graduated from the program, the Board found that Eastwick's Bridge Program's first and second graduating classes failed to achieve the 75% pass rate mandated by the regulation.

Eastwick appealed the Board's determination, challenging the methodology used by the Board to calculate the pass rate of the Bridge Program's graduates on the licensing examination. Eastwick contended that only students who graduated during a specific calendar year and took the licensing examination in that year should be included in that year's "graduating class."

2

Using that methodology, Eastwick argued that its second graduating class had a pass rate in excess of 75%, and that the Board improperly declined to accredit its nursing program. An Appellate Division panel affirmed the Board's determination denying accreditation.

Based on the plain language of N.J.A.C. 13:37-1.3(c)(2), we conclude that the Board's construction of its regulation is plainly unreasonable, and accordingly hold that the Board improperly denied accreditation to Eastwick's Bridge Program. We therefore reverse the Appellate Division's judgment affirming the Board's action, and remand this matter for further proceedings.

## I.

In accordance with the Legislature's grant of authority in the Nurse Practice Act, N.J.S.A. 45:11-24(d)(19), the Board "prescribe[s] rules and regulations" governing the profession of nursing. The Board maintains oversight of professional licensing for nurses; it requires that all applicants for licensure as registered nurses pass the National Council Licensure Examination for Registered Nurses (NCLEX-RN). N.J.A.C. 13:37-2.1(a).

The Board also has established a process for the accreditation of schools of professional nursing. N.J.S.A. 45:11-24(d)(13); see also N.J.A.C. 13:37-1.1 to -1.18. To

3

establish a nursing program, an educational institution must file an application pursuant to N.J.A.C. 13:37-1.2.  If the Board grants provisional accreditation to the new nursing program, the program may admit students.  N.J.A.C. 13:37-1.3(a). The program may retain its provisional status for no more than two years after the date on which the first class graduates. N.J.A.C. 13:37-1.3(e).

A provisionally accredited nursing program may not be fully accredited until it meets the following requirements, set forth in N.J.A.C. 13:37-1.3(c):

> 1. The first class has graduated;
>
> 2. Seventy-five percent of students from the first or second graduating class, who have taken the licensing examination, pass the examination the first time it is taken by the student; and
>
> 3. A self-study report is submitted to the Board that shows the nursing program is in compliance with the requirements of N.J.A.C. 13:37-1.4 through 1.11.

The regulation does not define the term "graduating class," or otherwise specify how a nursing program's "graduating class" should be defined when the pass rate is calculated.  Prior to its dispute with Eastwick, the Board publicly interpreted that term in the minutes of a meeting held on June 17, 2008.  Those minutes state:  "'class' as per N.J.A.C. 13:37-1.3 will be defined as all the graduates from a nursing program who are

4

first-time NCLEX test takers during a one-year period of time extending from January 1 through December 31." The Board, however, did not amend its regulation to incorporate that definition, in accordance with the rulemaking procedures of the Administrative Procedure Act (APA). See N.J.S.A. 52:14B-3, 4, 4.9 to -5.

This case arose from Eastwick's application for the accreditation of its Bridge Program, designed to meet the needs of licensed professional nurses aspiring to become registered nurses.[1] Under the plan devised by Eastwick, a student would commence his or her studies on one of four alternative dates in a calendar year and be awarded an Associate Degree in Applied Science in Nursing at the conclusion of the program. Following graduation, the student would be eligible to take the NCLEX-RN, but would not be required by the school to do so.

On September 22, 2009, the Board granted provisional accreditation to Eastwick's Bridge Program. Eastwick admitted its first group of students shortly thereafter. Its first twenty graduates received their associate nursing degrees in

---

[1] Eastwick, founded in 1968, serves a diverse student population consisting primarily of older students who have been out of school and employed for a decade or more. When it sought accreditation for its Bridge Program, Eastwick had already achieved and maintained full accreditation for two nursing programs, its Licensed Practical Nursing Program and its Bilingual Licensed Practical Nursing Program.

January 2011.  Nineteen of those twenty students, or 95%, passed the NCLEX-RN licensing examination.  Eastwick graduated additional groups of students in April, July and October 2011. When the examination results of all of the students who graduated from the Bridge Program in 2011 and took the NCLEX-RN during that year were aggregated, the pass rate was 69.49%, short of the 75% required by N.J.A.C. 13:37-1.3(c)(2).

On February 27, 2012, the Board requested that Eastwick assess the deficiencies in its program and present an action plan to improve student performance.  Eastwick evaluated factors including its admission criteria, its curriculum, and the time gap between the students' course work and the NCLEX-RN examination.  It prepared an action plan to improve its program, and submitted that plan to the Board in July 2012.

The ninety-seven students who graduated from the Bridge Program in January, April, July and October 2012, and took the NCLEX-RN examination for the first time that year, fared better than their predecessors; seventy-four, or 76.29%, of the 2012 graduates passed the examination.  Eastwick reported those results to the Board.  The Board, however, recalculated the NCLEX-RN pass rate for the Bridge Program's 2012 graduates, using a different methodology.  In the statistics for the Bridge Program's "second graduating class," the Board included the test results of twenty-four students who graduated from the Bridge

Program in 2011, but did not take the NCLEX-RN examination until 2012. On that basis, the Board calculated a 71.07% pass rate -- short of the required 75% -- for that class.

On June 24, 2013, the Board entered a Provisional Order of Probation and Denial of Accreditation (Provisional Order), pursuant to N.J.A.C. 13:37-1.3(e). The Board conceded that Eastwick had met the requirements of N.J.A.C. 13:37-1.3(c)(1) and (3) by graduating its first class and submitting a self-study report, but found that Eastwick failed to satisfy the pass rate requirement of N.J.A.C. 13:37-1.3(c)(2). The Board stated its intent to deny the Bridge Program accreditation and to place it on probation, effective thirty business days after entry of the Board's Provisional Order, unless Eastwick submitted a written request to modify or dismiss the Board's findings.

Eastwick submitted its request for modification or dismissal. It first argued that the twenty students who graduated from the Bridge Program in January 2011, whose pass rate on the NCLEX-RN examination was 95%, should be deemed to separately constitute a "graduating class." In the alternative, Eastwick contended that if the term "graduating class" were defined based on a calendar year, the "class" should include all students who graduated and took the NCLEX-RN licensing examination for the first time during the year of graduation.

7

Eastwick contended that under either methodology, its "first or second graduating class" achieved the required pass rate.

The Board rejected Eastwick's arguments. It voted to implement its Provisional Order as a Final Order of Probation and Denial of Accreditation (Final Order). The Board found Eastwick's method of calculating its "graduating class" contravened nationally accepted nursing education policies, and deemed it to be arbitrary, capricious and overly burdensome. In support of its construction of N.J.A.C. 13:37-1.3(c)(2), the Board cited the June 17, 2008 minutes of its public meeting, in which it provided its definition of "class."

Eastwick appealed the Board's Final Order. An Appellate Division panel affirmed the Board's determination, concluding that the Board's findings were supported by substantial credible evidence in the record.

We granted Eastwick's petition for certification. 220 N.J. 572 (2015).

## II.

Eastwick contends that it met N.J.A.C. 13:37-1.3(c)(2)'s requirements because the twenty students who graduated from the Program in January 2011 had a 95% pass rate on the NCLEX-RN licensing examination. Alternatively, Eastwick urges the Court to define a "graduating class" to include all graduates of a nursing program in a particular year who took the examination in

that same year.  Eastwick argues that the Board's construction of N.J.A.C. 13:37-1.3(c)(2) is plainly unreasonable, and that the Board's determination was arbitrary and capricious.  It contends that, to the extent that the Board relies on the definition of "class" in the minutes of its June 17, 2008 public meeting, the Board's action constitutes improper rulemaking contrary to the APA, under this Court's decision in Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 331-32 (1984).

The Board counters that the Court must defer to an agency's interpretation of its regulation.  It construes the term "graduating class" in N.J.A.C. 13:37-1.3(c)(2) to include any graduate of a nursing program, no matter when he or she graduated, who took the NCLEX-RN licensing examination for the first time in a particular year.  The Board cites the minutes of its June 17, 2008 public meeting as evidence that its methodology in applying N.J.A.C. 13:37-1.3(c)(2) was publicly disclosed and states that it did not engage in improper rulemaking.  It defines Eastwick's "first graduating class" to include all of its graduates who sat for the examination in 2011, and its "second graduating class" to include all of its graduates -- including students who graduated in 2011 -- who took the NCLEX-RN examination for the first time in 2012.  The Board argues that when Eastwick's first and second "graduating

9

classes" are defined accordingly, neither the first nor the second graduating class of Eastwick's Bridge Program achieved the required pass rate on the NCLEX-RN examination.

### III.

As a final determination of an administrative agency, the Board's Final Order is entitled to substantial deference. Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007) (citing In re Taylor, 158 N.J. 644, 656 (1999)). An appellate court will not reverse an agency's final decision unless the decision is "arbitrary, capricious, or unreasonable," the determination "violate[s] express or implied legislative policies," the agency's action offends the United States Constitution or the State Constitution, or "the findings on which [the decision] was based were not supported by substantial, credible evidence in the record." Ibid.; see also N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008) (quoting In re Petition for Rulemaking, 117 N.J. 311, 325 (1989)).

An appellate court "defer[s] to an agency's interpretation of . . . [a] regulation, within the sphere of [its] authority, unless the interpretation is 'plainly unreasonable.'" U.S. Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012) (second and third alteration in original) (quoting In re Election Law Enf't Comm'n

10

Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010)); see also Acoli v. N.J. State Parole Bd., 224 N.J. 213, 229 (2016). That principle derives "from the understanding that a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." In re Election Law Enf't, supra, 201 N.J. at 262. Accordingly, it is "a rare day when an agency cannot give a plausible interpretation for one of its own regulations." U.S. Bank, N.A., supra, 210 N.J. at 203-04.

To apply the "plainly unreasonable" standard, we first consider the words of the statute, affording to those words "their ordinary and commonsense meaning." In re Election Law Enf't, supra, 201 N.J. at 263 (quoting State v. Gelman, 195 N.J. 475, 482 (2008)). In that inquiry, "[w]e interpret a regulation in the same manner that we would interpret a statute." U.S. Bank, N.A., supra, 210 N.J. at 199 (citing Bedford v. Riello, 195 N.J. 210, 221-22 (2008)). The "paramount goal" is to determine the drafter's intent, and "[g]enerally, the drafter's intent is found in the actual language of the enactment." Ibid. We do not "rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning." Ibid.

Should the plain language analysis yield more than one plausible interpretation of the regulation, a reviewing court

11

may consider extrinsic sources, including "the long-standing meaning ascribed to the language by the agency charged with its enforcement." Bedford, supra, 195 N.J. at 222 (citing Malone v. Fender, 80 N.J. 129, 137-38 (1979)). If, however, the regulation's "language is clear, then the interpretative process will end without resort to extrinsic sources." Ibid.; see also U.S. Bank, N.A., supra, 210 N.J. at 199 (quoting Bedford, supra, 195 N.J. at 222); In re Election Law Enf't, supra, 201 N.J. at 263 (citing DiProspero v. Penn, 183 N.J. 477, 492-93 (2005)); Lozano v. Frank DeLuca Constr., 178 N.J. 513, 522 (2004). Our task is to "construe the regulation as written." U.S. Bank, N.A., supra, 210 N.J. at 199.

Guided by those principles, we consider the meaning of the term "first or second graduating class" in N.J.A.C. 13:37-1.3(c)(2). That provision uses the term to require, as a condition of full accreditation, that 75% of students from the "first or second graduating class," who have taken the licensing examination, pass the examination the first time it is taken by the student. N.J.A.C. 13:37-1.3(c)(2).

The regulation's terminology conveys two important concepts. First, in its "ordinary and commonsense" usage, the term "class" does not denote a cohort of students who have graduated from a professional school in different years, but have taken a licensing examination in the same calendar year.

12

Instead, the term "class," modified by "graduating," describes a group of students who complete a program of studies and receive their diplomas or certificates in a given calendar year.[2]

Second, N.J.A.C. 13:37-1.3(c)(2) is plainly intended to give a new nursing program two opportunities to succeed. The program may promptly achieve full accreditation if its "first graduating class" achieves satisfactory test results. N.J.A.C. 13:37-1.3(c)(2). Should that class fall short of the mark, however, the program's administrators may critically evaluate the program and address any deficiencies revealed by the first class's examination results, thereby restoring the program's opportunity to achieve full accreditation. To that end, the Board is presented with two sets of NCLEX-RN results, reflecting the achievements of distinct groups of students graduating in different years, and tested by the NCLEX-RN examination administered in the year of graduation. Thus, the clear objective of N.J.A.C. 13:37(c)(2) is furthered if the "second graduating class" includes only students who have graduated from

---

[2] We do not concur with Eastwick's argument that each of the four small groups of students who receive their degrees in a specific year should be considered a separate "graduating class" for purposes of N.J.A.C. 13:37-1.3(c)(2). Under that construction of the regulation, the Board would be compelled to accredit a nursing program based on very limited data, and a deficient program would have no meaningful opportunity to improve its curriculum for the benefit of a second "graduating class."

13

the program in its second year, following the program's opportunity for self-evaluation and improvement.

The Board's interpretation of the term "first or second graduating class" is simply incongruent with the language of its regulation.  The Board could have advised nursing programs in N.J.A.C. 13:37-1.3(c)(2) that their pass rates would be calculated based on students' examination dates, not their graduation dates, but did not do so.  Nothing in N.J.A.C. 13:37-1.3(c)(2) suggests that a "graduating class" is defined by the date of the licensing examinations that its students choose to take.  Indeed, we cannot, after the fact, "insert qualifications into a . . . regulation that are not evident by the enactment's language."  U.S. Bank, N.A., supra, 210 N.J. at 202.  Our task is to apply that regulation based upon its express terms.

Moreover, the Board's interpretation of N.J.A.C. 13:37-1.3(c)(2) would undermine the objective of giving new nursing programs an opportunity to assess and resolve deficiencies revealed by the pass rate of the first "graduating class."  If examination results from a first graduating class are combined with those of the second, a program's efforts to improve are not accurately measured.

The language of N.J.A.C. 13:37-1.3(c)(2) stands in stark contrast to that of the regulations implemented in other jurisdictions, cited by the Board as evidence of a national

14

practice.  Pennsylvania's regulation, for example, uses the term "first-time examinees" to define the group of students whose examination results are used to calculate a nursing program's pass rate.  See 49 Pa. Code § 21.162b(3) (requiring "a minimum pass rate of 80% or more of its first-time examinees during an examination year").  Connecticut's regulation similarly tethers the pass rate to the timing of the licensing examination.  See Conn. Agencies Regs. § 20-90-47(b)(2)(A) (requiring "an average passing rate of at least 80% of students taking the licensing examination . . . upon their first attempt after graduation, as reported from May 1 to April 30").  The regulations in effect in these jurisdictions clearly place their states' nursing programs on notice that for purposes of accreditation, their licensing examination pass rates will be calculated based on the students' year of examination, whether or not they graduated in that year. In contrast, the Board has not incorporated its stated methodology into N.J.A.C. 13:37-1.3(c)(2).[3]

---

[3] Both of the prior versions of N.J.A.C. 13:37-1.3(c)(2) used the term "graduating class."  See N.J.A.C. 13:37-1.2(c)(3) (1985) (assigning new nursing programs provisional accreditation status "until the licensing examination results of the first graduating class are received and evaluated by the Board"); N.J.A.C. 13:37-1.3(b)(2) (2003) (requiring, as a condition of accreditation, that "[e]ighty percent of students from the first graduating class, who have taken the licensing examination, pass the first time they take it").

15

In short, notwithstanding our deferential review of the Board's construction of its regulation, we discern no foundation for its interpretation of the plain language in N.J.A.C. 13:37-1.3(c)(2), and find its interpretation of N.J.A.C. 13:37-1.3(c)(2) to be plainly unreasonable.

Accordingly, when the Board calculated the NCLEX-RN examination pass rate for the "second graduating class" of Eastwick's Bridge Program, it improperly included the examination results of the twenty-four students who graduated from the Bridge Program during its first year, 2011, but did not take the examination until 2012. Based on the express terms of N.J.A.C. 13:37-1.3(c)(2), the Board should have calculated the pass rate for the Bridge Program's "second graduating class" based on the NCLEX-RN examination results of the ninety-seven students who graduated in 2012, and took the examination for the first time in that calendar year. The record indicates that seventy-four of those students, or 76.29%, passed the NCLEX-RN examination. Under a proper application of N.J.A.C. 13:37-1.3(c)(2), the Board would have found the "second graduating class" of Eastwick's Bridge Program to have achieved a NCLEX-RN pass rate above the required 75%.

Therefore, we find that the Board's September 27, 2013 Final Order denying accreditation and placing the Bridge Program on probation was unsupported by substantial credible evidence in

16

the record, and that the Board improperly denied accreditation in accordance with N.J.A.C. 13:37-1.1 to -1.3. We reverse the Appellate Division's judgment affirming the Final Order, and remand this matter to the Board. Because we base our ruling on the plain language of N.J.A.C. 13:37-1.3(c)(2), we do not reach the question of whether the Board's definition of "class," set forth in the minutes of the Board's June 17, 2008 public meeting, constituted improper rulemaking under Metromedia, supra, 97 N.J. at 331-32.

We note that our decision is based solely on the record that was before the Board when it issued its Final Order. We make no determination as to whether Eastwick would have met the requirements to maintain accreditation, prescribed in N.J.A.C. 13:37-1.4 to -1.15, after the Board's Final Order. On remand, a record regarding the Bridge Program's status following the Final Order can be developed, and an appropriate remedy determined.

IV.

The judgment of the Appellate Division is reversed, and this matter is remanded to the Board for proceedings in accordance with this opinion.


CHIEF JUSTICE RABNER, JUSTICES ALIBN and SOLOMON, and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion. JUSTICES LaVECCHIA and FERNANDEZ-VINA did not participate.

17