**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2802-22

IN THE MATTER OF
TREATMENT WORKS
APPROVAL (TWA)
NO. 23-0001/P.I. #1008226.

Submitted February 26, 2025 – Decided August 26, 2025

Before Judges Currier, Marczyk, and Torregrossa-O'Connor.

On appeal from the New Jersey Department of Environmental Protection.

Lieberman Blecher & Sinkevich, PC, attorneys for appellant WoodMeier Farms, LLC (Stuart J. Lieberman, of counsel and on the briefs; Zoe N. Ferguson and C. Michael Gan, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Department of Environmental Protection (Sookie Bae-Park, Assistant Attorney General, of counsel; Elizabeth Delahunty, Deputy Attorney General, on the brief).

The Spadaccini Law Firm, LLC, attorneys for respondent Green Medicine NJ, LLC (Robert W. Slomicz, of counsel and on the brief).

PER CURIAM

Appellant WoodMeier Farms, LLC (WoodMeier) appeals from the March 17, 2023 and amended January 5, 2024 New Jersey Department of Environmental Protection (DEP) design flow treatment works approval (TWA), approving an application by respondent Green Medicine NJ, LLC (GMNJ) and determining the design flow of its proposed septic system was below 2,000 gallons per day (gpd), thus authorizing the local Hunterdon County Department of Health (Hunterdon DOH) to approve the septic system. We affirm.

I.

In July 2022, GMNJ obtained approvals from the West Amwell Township Planning Board to convert a church into a cannabis cultivation facility (the Facility). GMNJ separately filed an application for a construction permit referral with the Hunterdon DOH, a local administrative authority under N.J.A.C. 7:9A, to use an existing septic tank on the property.

In October 2022, the Hunterdon DOH contacted the DEP regarding design flow calculations based on the proposed change of use for the Facility. The DEP advised the Hunterdon DOH that due to the "complexity of [the] project and the atypical application of [N.J.A.C.] 7:9A-7.4" a TWA was required for a determination of design flow under N.J.A.C. 7:9A-7.4(d). Subsequently, the

2

Hunterdon DOH referred the GMNJ septic application to the DEP for a Design Flow Only TWA.

On December 13, 2022, WoodMeier sent a letter to the DEP asserting the DEP had exclusive jurisdiction over the septic system due to the commercial cannabis cultivation use and the size of the septic system. On December 27, 2022, GMNJ submitted a TWA Permit Application Form (the Application) to the DEP seeking a design flow determination for the total primary activity design volume of sanitary wastewater pursuant to N.J.A.C. 7:9A. The Application noted the Hunterdon DOH originally approved the septic system with a design flow of 1,500 gpd based on church use, but the septic system has a capacity of up to 1,875 gpd. Moreover, the 30,000 square-foot Facility was split into two primary uses: a cultivation area and an office area. The office area consists of a total of 1,959 square feet with a maximum of thirty-five office workers per day, and the remaining 28,041 square feet of space was designated for cultivation and storage with a maximum of twenty-five cultivation workers per day. GMNJ's application sought a determination deeming the design flow in the cultivation space was either 860 gpd or 1,140 gpd, depending on the method of calculation used.

A-2802-22

In January 2023, WoodMeier corresponded with the DEP advising the Facility is a commercial facility under Table 7.4(a) of N.J.A.C. 7:9A-7.4. The correspondence included a separate letter from its engineer, Geoff Goll, P.E. of Princeton Hydro, providing reasons why the application should be treated as a commercial facility by the DEP for all septic purposes.

In February 2023, the DEP emailed GMNJ seeking clarification on the maximum number of employees for the Facility, separated into two categories for cultivation and office workers. GMNJ replied it had a maximum of twenty-five cultivation employees per day and thirty-five office employees, and on rare occasions, sixty employees in the office for a company meeting, which would include both the office and cultivation workers combined. The DEP wrote back to GMNJ seeking to clarify the figures for the twenty-five cultivation workers were based on per day, and not per shift numbers. GMNJ replied that the twenty-five cultivation workers was the maximum amount per day as there were no multiple shifts. On March 13, 2023, WoodMeier sent a letter to the DEP asserting the certification of the Hunterdon DOH submitted in support of GMNJ's TWA application appeared to improperly certify the design of the system, and alleged the Hunterdon DOH did not actually review the TWA application.

A-2802-22

On March 17, 2023, the DEP issued an initial Design Flow Only TWA (Initial TWA). The Initial TWA did not adopt GMNJ's figures but instead determined the total design flow for the Facility was 1,150 gpd, with 525 gpd for the office space and 625 gpd for the cultivation space. In accordance with N.J.A.C. 7:9A, because the DEP determined the total design flow was under 2,000 gpd, it referred the matter back to the Hunterdon DOH.

The DEP concluded design criteria listed in N.J.A.C. 7:9A-7.4 tbls. 7.4(a) and (b) were not appropriate for the cultivation area, so it used the "[f]actories/warehouses" criterion in N.J.A.C. 7:14A-23.3, in accordance with its Technical Manual. See Div. of Water Quality, Technical Manual for Applications for Treatment Works Approvals Under the Standards for Individual Subsurface Sewage Disposal Systems (N.J.A.C. 7:9A-3.9) (rev. 2022). Specifically, the DEP determined the "commercial use" or "warehouse" criteria in N.J.A.C. 7:9A-7.4 tbl. 7.4(a) were not applicable to the cultivation area and would not establish appropriate flows for the cultivation area.

In May 2023, WoodMeier appealed from the Initial TWA decision arguing, in part, that the DEP's determination was arbitrary and capricious in finding that the application did not fall within the pre-defined criteria set forth in N.J.A.C. 7:9A-7.4 tbls. 7.4(a) and (b) and that it was properly categorized as

a factory or warehouse under the Technical Manual. In July 2023, the DEP filed a motion to file as within time an amplification of the initial TWA decision, which this court denied in August 2023. In October 2023, the DEP moved to remand seeking to expand on its reasoning in the initial TWA. We granted the motion and directed the remand to be completed by January 5, 2024.

On January 5, 2024, the DEP issued an Amended Design Flow Only TWA (Amended TWA), reaching the same conclusions as the Initial TWA, but supplementing its reasoning. It noted "[t]he Standards for Individual Subsurface Sewage Disposal Systems (Standards) at N.J.A.C. 7:9A guide [it] in determining design volume for the purposes of a TWA." It differentiated between the office and cultivation use because it "determined that based on the two distinct and separate proposed uses of the Facility . . . it [was] not appropriate to apply one use to the entire [F]acility." (citing N.J.A.C. 7:9A-7.4(c)(1)). As to the 1,959 square-foot office area, consisting of a maximum of thirty-five employees, it determined the flow calculations utilizing the "commercial use" criterion in N.J.A.C. 7:9A-7.4 tbl. 7.4(a). This resulted in it finding the office area would use 525 gpd (35 employees x 15 gpd per employee).

Regarding the 28,041 square-foot cultivation area, consisting of a maximum of twenty-five employees, the DEP utilized the

"factories/warehouses" criterion in N.J.A.C. 7:14A-23.3, because the cultivation area did not fall into any pre-defined design criteria listed under N.J.A.C. 7:9A-7.4, including "commercial use" or "warehouse" use, and thus Tables 7.4(a) and (b) of N.J.A.C. 7:9A-7.4 were "inapplicable." It explained "[a] design flow calculation for a cannabis cultivation facility is an issue of first impression and is not addressed within the existing Standards." It determined the "commercial use" criterion in N.J.A.C. 7:9A-7.4 tbl. 7.4(a) was inapplicable because it did

> not align with the definition of "commercial use activities" at N.J.A.C. 7:9A-2.1. The cultivation area . . . will not be open to the public for direct sales, and the wastewater generated will be limited to employees in that portion of the [F]acility. The proposed cultivation area is not an industrial building or factory as those terms are used within the definition of "commercial use activities," considering the proposed activities, size, and number of employees.

The DEP also found applying the "commercial use" criterion ran "counter to the purposes of the Standards and incongruous with the Standards themselves," as applying it "to the office and cultivation areas" would result in a design flow of 3,750 gpd, or 62.5 gpd per employee, a figure which "significantly diverges from the accepted average [gpd] in related activities." It noted the higher flow determination would require a larger septic tank, "[b]ut a septic system . . . designed for a flow larger than what is actually discharged can

A-2802-22

. . . cause the system to not operate as intended and malfunction." It stated "applying the 'commercial use' criterion to the unique circumstances presented here, specifically a large floor space but low number of employees, is inappropriate and would not result in an accurate representation of the expected volume of sanitary sewage."

The DEP went on to explain the "'warehouse' criterion is not applicable to the cultivation area because it will not be primarily utilized in a storage capacity," but "will include activities akin to production and manufacturing." It noted the "goal of the Standards . . . is to ensure that the septic system will be sized properly so . . . the . . . system will not malfunction resulting in a threat to public health or the environment."

Because the DEP determined the criteria in Tables 7.4(a) and (b) of N.J.A.C. 7:9A-7.4 were inapplicable, it utilized design flow criteria from "alternative regulations." It found:

> N.J.A.C. 7:9A-1.2(b) authorizes the [DEP] to utilize "[d]ifferent requirements or specifications for individual subsurface sewage disposal systems" than are set forth in the Standards. See N.J.A.C. 7:9A-1.4 (authorizing the [DEP] to "exercise . . . discretion in respect to any matters not governed by this chapter."). Likewise, the Technical Manual permits the [DEP] to use information other than that located in N.J.A.C. 7:9A-7.4 to estimate the volume of sanitary wastewater. Such information contemplated by the Technical

A-2802-22

Manual includes "design flow criteria from other alternative regulations." The [DEP] add[ed] that the promulgation and use of the Technical Manual in reviewing a TWA application is contemplated by N.J.A.C. 7:9A-3.9(e).

[(Second and fourth alterations in original).]

The DEP found it appropriate to utilize the "factories/warehouses" criterion from the New Jersey Pollutant Discharge Elimination System (NJPDES) rules' "projected flow criteria" at N.J.A.C. 7:14A-23.3, which "like the Standards," are "used to determine wastewater flows." It noted "this criterion accurately represent[ed] the unique use of the cultivation area, that being a mixture of manufacturing, production, and storage." It concluded that under N.J.A.C. 7:9A-1.8, the Amended TWA authorized Hunterdon DOH to approve the location, construction, or alteration of an individual subsurface sewage disposal system.

## II.

On appeal, WoodMeier Farms argues the DEP's use of N.J.A.C. 7:14A-23.3 as opposed to N.J.A.C. 7:9A-7.4 was arbitrary and capricious. It further asserts the DEP's determination that the application does not fall within any pre-defined design criteria listed in N.J.A.C. 7:9A-7.4 was unreasonable, and the DEP's finding that the application was not a commercial use was not supported

by the record. It further contends the regulations do not permit the DEP to employ its discretion "carte-blanche."

Review of an administrative agency's final determination is limited. In re Carter, 191 N.J. 474, 482 (2007). Appellate courts will uphold an agency's decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Stein v. Dep't of L. & Pub. Safety, 458 N.J. Super. 91, 99 (App. Div. 2019) (quoting J.B. v. N.J. State Parole Bd., 229 N.J. 21, 43 (2017)). In evaluating whether the decision was arbitrary, capricious, or unreasonable, we examine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonable have been made on a showing of the relevant factors.
>
> [In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. at 482-83).]

In addition, courts are "obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs." In re

Reallocation of Prob. Officer, 441 N.J. Super. 434, 444 (App. Div. 2015) (quoting In re N.J. Pinelands Comm'n Resol. PC4-00-89, 356 N.J. Super. 363, 372 (App. Div. 2003)).  Thus, appellate courts "give substantial deference to an agency's interpretation of the statute it is charged with carrying out, as well as to the interpretation the agency itself gives to its own regulations."  Fedor v. Nissan of N. Am., Inc., 432 N.J. Super. 303, 320 (App. Div. 2013).  That deference is due "because 'a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise.'"  U.S. Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012) (quoting In re Election L. Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010)).  Nevertheless, courts will not defer to an agency's interpretation of its own regulations if that interpretation is "plainly unreasonable."  Ibid. (quoting In re Election, 201 N.J. at 262).  If a court "is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result."  Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001).  "Accordingly, it is 'a rare day when an agency cannot give a plausible interpretation for one of its own regulations.'"

In re Eastwick Coll. LPN-RN Bridge Program, 225 N.J. 533, 542 (2016) (quoting U.S. Bank, 210 N.J. at 203-04).

In our de novo review of an agency's interpretation of one of its regulations, "[w]e interpret a regulation in the same manner that we would interpret a statute." Ibid. (alteration in original) (quoting U.S. Bank, 210 N.J. at 199). Our "paramount goal" is to determine the intent of the drafter, which can generally be "found in the actual language of the enactment." U.S. Bank, 210 N.J. at 199. An appellate court will not "rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning." Ibid. "Should the plain language analysis yield more than one plausible interpretation of the regulation, a reviewing court may consider extrinsic sources, including 'the long-standing meaning ascribed to the language by the agency charged with its enforcement.'" In re Eastwick, 225 N.J. at 542 (quoting Bedford v. Riello, 195 N.J. 210, 222 (2008)). "If, however, the regulation's 'language is clear, then the interpretative process will end without resort to extrinsic sources.'" Ibid. (quoting Bedford, 195 N.J. at 222). "In short, we must construe the regulation as written." U.S. Bank, 210 N.J. at 199.

A-2802-22

WoodMeier contends the DEP's decision not to use the standards under N.J.A.C. 7:9A-7.4 for commercial uses and instead utilize the methodology set forth in N.J.A.C. 7:14A-23.3 to issue the TWA was unreasonable because "N.J.A.C. 7:14A-23.3 is meant to be used for larger systems that have treatment [components] prior to discharge." (citing N.J.A.C. 7:14A-23.1). It argues the DEP's "decision violates [its] own interpretation of the regulations." It asserts the DEP removed the "type of establishment" categories from N.J.A.C. 7:9A-7.4 that are used in N.J.A.C. 7:14A-23.3.

WoodMeier further asserts the Facility "is appropriately categorized as the activity 'commercial use,' and therefore is required to use the gross square footage pursuant to N.J.A.C. 7:9A-7.4." It contends the DEP's explanation for why the Facility is not a "commercial use" is not supported by the record. Specifically, WoodMeier argues "commercial use activities" as defined in N.J.A.C. 7:9A-2.1 applies "as the [F]acility will grow, cure, package, store, and distribute cannabis products. The proposed activity . . . is akin to a wholesale farm store." WoodMeier relies on the DEP's comments in proposing the new term "[c]ommercial use activity" where it noted:

> "Commercial use activities": This proposed new term is
> used in the proposed design criteria which are based on

[the] type of activity generating sanitary sewage. The proposed design criteria project the volume generated from various types of activities with commercial use activities being those associated with facilities that include stores, offices, professional centers, industrial buildings, and manufacturing facilities. . . .

[43 N.J.R. 478(a), 482 (proposed Mar. 7, 2011).]

WoodMeier notes "the rule did not propose separate categories for manufacturing or production activities."  It argues the TWA itself shows the Facility will conduct commercial activities, as the DEP determined "warehouse" use was inapplicable because the cultivation area would "include activities akin to production and manufacturing," or a "mixture of manufacturing, production, and storage."  It asserts nothing in the "commercial use activities" definition in N.J.A.C. 7:9A-2.1 requires "a commercial facility to be open to the public for direct sales or not be limited to employees."

GMNJ counters the DEP correctly determined the design volume based on the "type of activity" instead of the "type of establishment" as evidenced by its separate calculations for the office space and cultivation area.  It further asserts the 2012 amendments to N.J.A.C. 7:9A-7.4 neither "repeal N.J.A.C. 7:14A-23.3" nor "eliminate the categories being used" in the regulation.  It also points to the rule proposal for the 2012 amendment, where the DEP stated:

14                                                    A-2802-22

The proposed amendments to N.J.A.C. 7:9A-7.4(d) reword the opening paragraph to specify that if the [Hunterdon DOH] determines that the activity is not listed in Tables 7.4(a) or 7.4(b), nor a TWA issued, the administrative authority [here, the Hunterdon DOH] will direct the applicant to apply to [the DEP] for a TWA for the determination of the total expected design volume. The [DEP] will determine the most appropriate design volume based on the activities proposed at the facility. Therefore, the proposed amendments eliminate the ability of the administrative authority to determine flow based on actual water use data unless a TWA is issued.

[43 N.J.R. at 498.]

GMNJ asserts this "is precisely what occurred" when the Hunterdon DOH directed GMNJ to apply for a TWA and the DEP "us[ed] its expertise and design flow criteria from alterative regulations, [and] determined the most appropriate design volume based on the activities proposed at the [F]acility."

GMNJ asserts the DEP correctly determined the proposed use of the facility is not a "'[c]ommercial use activity' because the primary activity considered" is the cultivation of cannabis and "is not related to the buying or selling of goods or services." It asserts the "core of the definition [of 'commercial use activity'] in N.J.A.C. 7:9A-2.1 is the buying and selling of goods or services." GMNJ contends "cultivation" cannot be a "commercial use activity" under N.J.A.C. 7:9A-2.1 "because it is not the buying or selling of

goods that is the primary activity. The primary activity is the production of plant material." It asserts "[i]t is clear that 'commercial use activities' refers to something . . . less broad than simply any activity in the course of commerce."

GMNJ argues the cultivation of cannabis "is not like a wholesale farm store, but more akin to a farm. Farm stores sell the produce grown on a farm," whereas the Facility here "does not propose to buy or sell cannabis grown elsewhere; it proposes to produce the cannabis product." It points out the "cultivation area will not be open to the public for direct sales to customers, and the wastewater generated will be limited to employees" in the cultivation area. It argues the DEP was correct to use the flow criteria of "factories/warehouses" from N.J.A.C. 7:14A-23.3 "because the cultivation area, like a factory, is a portion of a building used to produce a product."

The DEP asserts that applying the "'commercial use' criterion in N.J.A.C. 7:9A-7.4 would be counter to the purposes of the Standards and the Standards themselves," and it properly utilized the "factories/warehouse" criterion under N.J.A.C. 7:14A-23.3 for its flow calculations. It asserts it appropriately identified the primary activities for the Facility—office space and a cultivation area. It notes that applying N.J.A.C. 7:9A-7.4's "commercial use" criterion to the entire Facility without distinguishing between the office and cultivation area

would result in a design flow of 3,750 gpd, or 62.5 gpd per employee. It asserts flows approaching 62.5 gpd per employee "account not just for things such as toilets, but kitchens, laundry facilities, dishwashers, and shower facilities, uses not applicable to the cultivation area at issue here."[1]

The DEP notes that N.J.A.C. 7:9A-1.4 allows it to "exercise [its] discretion in respect to any matters not governed by [the] chapter." Moreover, it contends it appropriately utilized the Technical Manual and the NJPDES rules under N.J.A.C. 7:14A-23.3. It argues N.J.A.C. 7:9A-7.4 was enacted to prevent the "shoehorn[ing of] facilities into a particular single type of establishment to calculate design volume," and allows a thorough review of "all activities at a facility that will generate sanitary sewage and accurately determin[e] the maximum anticipated volume of sanitary sewage to the system based on maximum use." 43 N.J.R. at 497. It further asserts the rule proposals were enacted to allow it to "determine the most appropriate design volume based on the activities proposed at the facility." 43 N.J.R. at 498.

We conclude the DEP sensibly differentiated between the office use and cultivation area under N.J.A.C. 7:9A-7.4(c)(1) and reasonably determined the

_____

[1] The DEP asserts such a large number is more reflective of larger facilities such as lodging houses, motels, and boarding schools.

cultivation activities did not fall within the activities listed in Tables 7.4(a) and (b), thereby utilizing the "factories/warehouse" criterion under N.J.A.C. 7:14A-23.3. The DEP did not act arbitrarily in deciding the commercial use activity did not apply to the cultivation area because the primary activity—the cultivation of cannabis—is not related to the buying or selling of goods or services. Specifically, it noted the "commercial use" criterion in N.J.A.C. 7:9A-7.4 tbl. 7.4(a) did not "align with the definition of 'commercial use activities' at N.J.A.C. 7:9A-2.1. The cultivation area . . . will not be open to the public for direct sales, and the wastewater generated will be limited to employees in that portion of the [F]acility." Moreover, it noted, "[t]he proposed cultivation area is not an industrial building or factory as those terms are used within the definition of 'commercial use activities.'"

The DEP further concluded "applying the 'commercial use' criterion to the unique circumstances presented here, specifically a large floor space but low number of employees, is inappropriate and would not result in an accurate representation of the expected volume of sanitary sewage." We determine it "utiliz[ed] its expertise," and its findings were reasonable based on the record before it.

We further determine the DEP reasonably concluded "N.J.A.C. 7:9A-1.2(b) authorize[d] [it] to utilize '[d]ifferent requirements or specifications for individual subsurface sewage disposal systems' than are set forth in the Standards." (quoting N.J.A.C. 7:9A-1.2(b)); <u>see also</u> N.J.A.C. 7:9A-1.4 (authorizing the DEP to "exercise . . . discretion in respect to any matters not governed by this chapter"). Likewise, it did not act arbitrarily looking to N.J.A.C. 7:14A-23.3 because the criterion there more accurately addressed the "unique use of the cultivation area."

In short, the DEP reasonably exercised its regulatory authority in issuing the design flow TWA under the circumstances presented in this matter. Its findings were not arbitrary, capricious, or unreasonable given the circumstances presented, and we discern no basis to disturb its decision.

B.

WoodMeier asserts the DEP erred in relying on N.J.A.C. 7:9A-1.2(b) to avoid using the regulations in N.J.A.C. 7:9A-7.4, because when read in full, N.J.A.C. 7:9A-1.2(b) states the requirements in N.J.A.C. 7:9A are the minimum requirements for systems with expected volumes under 2,000 gpd. It also argues the DEP erred in relying on the Technical Manual to allow it to use alternative flow calculations. It asserts the DEP's reliance on N.J.A.C. 7:9A-3.9(e) was

19

wrong because that provision "does not provide that the [DEP] may set new standards for designing systems within the [T]echnical [M]anual; it simply provides the application forms and instructions on administrative and technical submission requirements." WoodMeier contends that allowing the DEP to give priority to its Technical Manual as it does here, would render meaningless the regulations setting uniform standards and obviate the need for formal rulemaking.

WoodMeier further argues under N.J.S.A. 13:1D-111, the DEP's "reliance on a technical manual that sets forth alleged substantive requirements as to how to calculate flows, exceeds the statutory authority for the [T]echnical [M]anual and constitutes de facto rule making," implicating all six factors under Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 331-32 (1984).

GMNJ contends its TWA application "was evaluated pursuant to the administrative and technical requirements 'which may be established by the [DEP] in a technical manual prepared in accordance with N.J.S.A. 13:1D-111.'" (quoting N.J.A.C. 7:9A-3.9(e)). It argues the Technical Manual allows the DEP to look beyond N.J.A.C. 7:9A-7.4 to determine the total primary activity design volume of sanitary wastewater in a TWA, including "design flow criteria from alternative regulations." See Technical Manual, § 3F. Thus, GMNJ asserts the

DEP was permitted to use the design flow criteria in N.J.A.C. 7:14A-23.3 to determine the design flow for the TWA at issue.

The DEP contends because this case deals with its "highly technical flow calculations," this court should defer to its TWA determination. It argues because the flow categories in N.J.A.C. 7:9A-7.4 were inappropriate for the cultivation area, it is authorized to "look[] to flow criteria in the NJPDES rules." It asserts this authority arises from N.J.A.C. 7:9A-1.2(b), which authorizes them "to utilize '[d]ifferent requirements or specifications for individual subsurface sewerage disposal systems' than are set forth in the Standards." (alteration in original) (quoting N.J.A.C. 7:9A-1.2(b)). It also points to N.J.A.C. 7:9A-1.4 which authorizes it to "exercise [its] discretion in respect to any matters not governed by [N.J.A.C. 7:9A]." The DEP contends the Technical Manual "permits [it] to use information other than that located in N.J.A.C. 7:9A-7.4 to estimate the volume of sanitary wastewater," and "use of the Technical Manual in reviewing a TWA application is contemplated by N.J.A.C. 7:9A-3.9(e)."

The DEP asserts it "appropriately referred" to the Technical Manual in issuing its Amended TWA decision. It contends N.J.S.A. 13:1D-111 authorizes it "to develop technical manuals, exempt from the requirements of the APA,[2]

---

2 Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -31.

to, among other things, 'clarify departmental policies, and interpretations of any laws, rules, and regulations.'"   (quoting N.J.S.A. 13:1D-111). It argues the authority granted to it via N.J.S.A. 13:1D-111 "is explicitly incorporated into the Standards at N.J.A.C. 7:9A-3.9(e), which allows the [DEP] to develop a technical manual prepared in accordance with N.J.S.A. 13:1D-111."   It also points to N.J.S.A. 13:1D-112(a), which states:

> Policies and interpretations contained in a technical manual developed pursuant to [N.J.A.C. 12:1D-111] and in force on the date that an application for a permit subject to that technical manual has been filed, shall be binding upon both [the DEP] and a permit applicant, except as otherwise required under federal or State law, or rule or regulation promulgated thereunder . . . .
>
> [(Footnote omitted).]

It asserts the "Technical Manual was specifically developed pursuant to N.J.S.A. 13:1D-111 and N.J.A.C. 7:9A-3.9(e)," and "allows for 'design flow criteria from alternative regulations.'"   (quoting Technical Manual, § 3F.).

The DEP asserts the "use of the Technical Manual to calculate the volume of sanitary wastewater in the cultivation area is not de facto rulemaking as it need not be adopted in accordance with the APA."   It alternatively argues, "[n]evertheless," the Technical Manual passes the Metromedia test.  The DEP asserts "factors four and five are afforded the most weight in the overarching

analysis." (citing Coal. for Quality Health Care v. N.J. Dep't of Banking & Ins., 348 N.J. 272, 297 (App. Div. 2002)). It argues "[e]ven assuming factors one and three can be met, the other four factors cannot." The DEP contends the Technical Manual is not a "rule" under factor two of Metromedia because "it does not apply uniformly to all applicants." (citing Am. Cyanamid Co. v. N.J. Dep't of Env't Prot., 231 N.J. Super. 292, 307-08 (App. Div. 1989)). It argues the Technical Manual "does not impose any new requirements not already present or obviously inferable from the regulations, and thus does not meet Metromedia factors four and five." Instead, the DEP asserts "the regulations were utilized to calculate the TWA flow decisions and the Technical Manual was utilized as guidance on the '[t]ypes of alternative information that may be acceptable.'" (quoting Technical Manual, §3F). Finally, the DEP argues factor six is not met either as "the Technical Manual does not interpret law or policy, but merely restate[s] existing statutory and regulatory constraints that already exist."

In exercising discretion when discharging its statutory duty, an agency may choose between formal action, such as rulemaking or adjudication, or informal action, provided the choice complies with due process requirements and the APA. See Nw. Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 135 (2001)

23

(citing <u>In re Solid Waste Util. Customer Lists</u>, 106 N.J. 508, 518 (1987)). Informal agency action constitutes the bulk of the activity of most administrative agencies and is defined as "any determination that is taken without a trial-type hearing, including investigating, publicizing, negotiating, settling, advising, planning, and supervising a regulated industry." <u>Id.</u> at 136-67 (citing <u>In re Solid Waste</u>, 106 N.J. at 519).

If an agency action constitutes a rule, it must comply with the APA requirements.[3]  Our Supreme Court in <u>Metromedia</u> provided standards for determining whether rulemaking requirements apply to or govern any agency

---

[3]  The APA defines a rule as follows:

> "Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency.  The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intra-agency and inter-agency statements; and (3) agency decisions and findings in contested cases.
>
> [N.J.S.A. 52:14B-2.]

decision or particular action. 97 N.J. at 331-34. An agency's informal action may constitute de facto rulemaking, despite the label the agency gives to it.[4]

The Legislature created an exemption to formal rulemaking under the APA, directing the DEP to develop technical manuals for various categories of

---

[4] The Court identified six circumstances that will render an agency determination an administrative rule:

> [A]n agency determination must be considered an administrative rule . . . . if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication.
>
> [Ibid.]

25

permits. The technical manuals are exempt from the rulemaking requirements of

the APA as articulated in N.J.S.A. 13:1D-111(d), which states a technical

manual

> shall define the procedural and substantive requirements for the completion of an application for a class or category of permit and the review thereof, and shall clarify departmental policies and interpretations of any laws, rules, and regulations relating to the filing and review of the application. Each technical manual shall also:
>
>> a.    Provide a detailed summary and explanation of any policy considerations not otherwise identified by law, rule, or regulation that are used in the [DEP]'s review and consideration of the permit application;
>>
>> b.    Detail and clarify the [DEP]'s interpretation of any standards or other requirements that do not have a fixed meaning or are not defined by law, rule, or regulation, including, but not limited to, identification or stipulation of state-of-the-art control technologies and best management practices; and
>>
>> c.    Include any other general information about department policies that would facilitate the preparation of an applicant, and the review by the department of an application.
>>
>> d.    Adoption of a technical manual, or of revisions thereto, shall not be subject to the

notice and publication requirements of the
[APA].

In adopting N.J.S.A. 13:1D-111, the Legislature recognized that in order to be an efficient regulatory agency, the DEP must be flexible and responsive to changing conditions, new methodologies, and developing science. Thus, the Legislature authorized the development and use of technical manuals to assist in the permit review process and to aid in agency efficiency. We conclude the DEP's use of the Technical Manual here was not de facto rulemaking as it did not have to be adopted in accordance with the APA.

As we have concluded the DEP did not act arbitrarily in exercising its discretion by determining the application was not governed by N.J.A.C. 7:9A, it reasonably relied on N.J.A.C. 7:9A-1.4 to exercise its discretion in utilizing N.J.A.C. 7:14A-23.3 for its flow calculations. Accordingly, we need not address the Metromedia factors.

To the extent we have not specifically addressed any remaining arguments raised by WoodMeier, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2802-22